**C.O. LAW, APC**
Clark Ovruchesky, Esq. (SBN: 301844)
co@colawcalifornia.com
3148 Midway Dr. Suite 203
San Diego, California 92110
Telephone: (619) 356-8960
Facsimile:  (619) 330-7610

**LAW OFFICE OF PETER G. MACALUSO**
Peter G. Macaluso, Esq. (SBN: 215730)
7230 S. Land Park Dr., Suite 127
Sacramento, CA 95831
Telephone: (916) 392-6591
Facsimile:  (916) 392-6950

*Attorneys for Plaintiff*,
Ericka Sexton

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **ERICKA SEXTON,**<br><br>**Plaintiff,**<br><br>v.<br><br>**WELLS FARGO BANK, N.A., SPECIALIZED LOAN SERVICING LLC, FDS BANK D/B/A MACY'S, INC., AMERICAN EXPRESS COMPANY, CITIBANK, N.A., EXPERIAN INFORMATION SOLUTIONS, INC., TRANS UNION LLC, and EQUIFAX INFORMATION SERVICES LLC,**<br><br>**Defendants.** | **Case No.:**<br><br>**COMPLAINT FOR DAMAGES FOR VIOLATIONS OF:**<br><br>**1.) THE FAIR CREDIT REPORTING ACT, 15 U.S.C. §§ 1681, ET SEQ.; AND**<br><br>**2.) CALIFORNIA CONSUMER CREDIT REPORTING AGENCIES ACT, CAL. CIV. CODE §§ 1785.1, ET SEQ.**<br><br>**JURY TRIAL DEMANDED** |

## INTRODUCTION

1. The United States Congress has found the banking system is dependent upon fair and accurate credit reporting.  Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system. Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* ("FCRA"), to insure fair and accurate reporting, promote efficiency in the banking system, and protect consumer privacy.  The FCRA seeks to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other information on consumers.  The FCRA also imposes duties on the sources that provide credit information to credit reporting agencies, called "furnishers."

2. There exists today in the United States a pervasive and fundamental misunderstanding about the long term impact filing a consumer bankruptcy has on a consumer's credit worthiness. Specifically, many consumers believe that because a bankruptcy can be reported on their credit report for ten years their credit worthiness will be ruined for the same length of time. This is not true.

3. The *majority* of consumer debtors who actually file consumer bankruptcy do so to ***raise*** their credit score and remedy their poor credit worthiness.

4. It is entirely possible for consumer debtors to have over a 700 Fico Score within as little as 12 months after filing a consumer bankruptcy (Chapter 7 or Chapter 13).

///

///

///

///

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

5. Plaintiff **ERICKA SEXTON** ("Plaintiff"), through her attorneys, brings this lawsuit to challenge the actions of Defendants **WELLS FARGO BANK, N.A. ("WFBNA", "Furnisher-Defendants", or "Defendants"), SPECIALIZED LOAN SERVICING LLC ("SLS", "Furnisher-Defendants", or "Defendants"), FDS BANK D/B/A MACY'S, INC. ("FDS", "Furnisher-Defendants", or "Defendants"), AMERICAN EXPRESS COMPANY ("AMEX", "Furnisher-Defendants", or "Defendants"), CITIBANK, N.A. ("CitiBank", "Furnisher-Defendants", or "Defendants"), EXPERIAN INFORMATION SOLUTIONS, INC. ("Experian", the "Credit Bureaus", or "Defendants"), TRANS UNION LLC ("TransUnion", the "Credit Bureaus", or "Defendants"), and EQUIFAX INFORMATION SERVICES LLC ("Equifax", the "Credit Bureaus", or "Defendants"),** with regard to Defendants' reporting of erroneous negative and derogatory reports to Plaintiff's credit report, as that term is defined by 15 U.S.C. § 1681a(g); Defendants' willful and negligent failure to properly investigate the repeated disputes of Plaintiff concerning the inaccurate data Defendants are reporting in Plaintiff's file, and Defendants' failure to correct such, which Defendants knew or should have known was erroneous and which caused Plaintiff damages.

6. Plaintiff makes these allegations on information and belief, with the exception of allegations that pertain to Plaintiff, or to Plaintiff's counsel, which Plaintiff alleges on personal knowledge.

7. While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

8. Unless otherwise stated, all the conduct engaged in by Defendants occurred in California.

9. Any violations by Defendants were knowing and intentional, and that Defendants did not maintain procedures reasonably adapted to avoid any such violation.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

10. Unless otherwise indicated, the use of any Defendants' name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of that Defendants named.

## JURISDICTION AND VENUE

11. Jurisdiction of this Court arises pursuant to 28 U.S.C. §1331; 15 U.S.C. § 1681p; and, 28 U.S.C. § 1367 for supplemental state law claims.

12. This action arises out of Defendants' violations of (i) the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq. ("FCRA"); and (ii) the California Consumer Credit Reporting Agencies Act, Cal. Civ. Code §§ 1785.1. et seq. ("CCRAA").

13. The Court has personal jurisdiction over Defendants as Defendants conduct business within the State of California and have purposefully availed themselves of the laws and markets of the State of California and this district.

14. Venue is proper in the United States District Court, Eastern District of California pursuant to 28 U.S.C. § 1391 for the following reasons: (i) Plaintiff resides in the County of Sacramento, State of California, which is within this judicial district; (ii) the conduct complained of herein occurred within this judicial district; and, (iii) Defendants conducted business within this judicial district at all times relevant.

## PARTIES

15. Plaintiff is a natural person who resides in the City of Sacramento, County of Sacramento, in the State of California.  In addition, Plaintiff is a "consumer" as that term is defined by: Cal. Civ. Code § 1785.3(b) and 15 U.S.C. § 1681a(c).

16. Defendant WFBNA is a credit union, whose primary corporate address is in the City of Sioux Falls, in the State of South Dakota, and is authorized to do business in the State of California.

///

///

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

17. Defendant SLS is a corporation, whose primary corporate address is in the City of Highlands Ranch, in the State of Colorado, and is authorized to do business in the State of California.

18. Defendant FDS is a corporation, whose primary corporate address is in the City of Mason, in the State of Ohio, and is authorized to do business in the State of California.

19. Defendant CitiBank is a corporation, whose primary corporate address is in the City of Sioux Falls, in the State of South Dakota, and is authorized to do business in the State of California.

20. Defendant AMEX is a corporation, whose primary corporate address is in the City of New York, in the State of New York, and is authorized to do business in the State of California.

21. Defendant Experian is a corporation whose primary corporate address is in the City of Costa Mesa, in the State of California, and is authorized to do business in the State of California.

22. Defendant TransUnion, LLC. is a corporation whose primary corporate address in in the City of Chicago, in the State of Illinois, and is authorized to do business in the State of California.

23. Defendant Equifax is a corporation whose primary corporate address is in the City of Atlanta, in the State of Georgia, and is authorized to do business in the State of California.

24. Defendants WFBNA, SLS, FDS, CitiBank, and AMEX ("Furnisher-Defendants") are each furnishers of information as contemplated by FCRA sections 1681s-2(a) & (b), which regularly and in the ordinary course of business furnish information to one or more consumer reporting agencies about consumer transactions or experiences with any consumer.

///

///

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

25. Plaintiff is informed and believes, and thereon alleges, that Furnisher-Defendants, in the ordinary course of business, regularly, on behalf of themselves or others, engage in "debt collection" as that term is defined by California Civil Code § 1788.2(b), and are therefore "debt collectors" as that term is defined by California Civil Code § 1788.2(c).

26. The Credit Bureaus are each a "consumer reporting agency" as that term is defined by 15 U.S.C. § 1681a(f) and Cal. Civ. Code § 1785.3.

27. The causes of action herein also pertain to Plaintiff's "consumer [credit] report" as that term is defined by 15 U.S.C. § 1681a(d)(1) and Cal. Civ. Code § 1785.3(c), in that inaccurate credit information was furnished by Furnisher-Defendants to "consumer reporting agencies," as that term is defined by Cal. Civ. Code § 1785.3(d), regarding specific transactions and/or experiences pertaining to Plaintiff and Plaintiff's credit worthiness, credit standing, and credit capacity. Such credit information was used or was expected to be used, or collected in whole or in part, for the purposes of serving as a factor in establishing Plaintiff's eligibility for, among other things, credit to be used primarily for personal, family, household and employment purposes.

## GENERAL CREDIT REPORTING INDUSTRY ALLEGATIONS

28. Plaintiff alleges that each and every Furnisher-Defendant was included and listed in Plaintiff's Chapter 13 Bankruptcy.

29. Plaintiff alleges that each and every Defendant is familiar with credit reporting industry standards and subscribes thereto.

30. Plaintiff alleges that each and every Defendant understands that deviation from credit reporting industry standards can and often does result in denial of credit, higher interest rates, and prompts those making credit decisions to draw a more negative inference from the reported data than if the Defendant reported in accordance with the recognized industry standard.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

31. Plaintiff alleges that all actions alleged herein by Defendants were done knowingly, intentionally, and in reckless disregard for credit reporting industry standards in an attempt to purposefully undermine Plaintiff's ability to reorganize and repair Plaintiff's FICO Score.

32. In the alternative, Plaintiff alleges that each and every Defendant's actions was the result of reckless policies and procedures that inevitably led to inaccurate, misleading, or incomplete credit reporting.

   **a. FICO**

33. FICO Inc. ("FICO") is a leading analytics software company with its principal headquarters located in San Jose California. FICO has over 130 patents related to their analytics and decision management technology, and regularly uses mathematical algorithms to predict consumer behavior including credit risk.

34. The FICO Score has become the standard measure of consumer credit risk in the United States and is used in ninety percent of lending decisions.

35. A FICO score consists of a three-digit number summarizing a consumer's credit risk or likelihood to repay a loan. FICO periodically updates its scoring models resulting in multiple FICO Score versions.

36. Base FICO Scores range from 300 to 850, while industry-specific FICO Scores range from 250-900. A higher FICO Score demonstrates lower credit risk or less likelihood of default.

37. Different lenders use different versions of FICO Scores when evaluating a consumer's credit worthiness.

38. There are 28 FICO Scores that are commonly used by lenders.

39. A consumer's FICO Score is calculated based solely on information in consumer credit reports maintained at credit reporting agencies ("CRAs").

40. The three largest CRAs are Equifax, Experian, and TransUnion.

///

///

41. FICO does not control what information is provided on a consumer's credit report. Instead, the scoring models or algorithms are based on the premise that information provided by the CRAs is accurate and complies with credit reporting industry standards.

42. There are five key factors that a FICO Score considers: 1) Payment history; 2) Debt Amount; 3) Length of Credit History; 4) New Credit; and 5) Credit Mix.

43. Each of the five factors is weighted differently by FICO.

44. 35% of a consumer's FICO Score relates to payment history, 30% relates to the amount of debt, 15% relates to the length of credit history, 10% relates to new credit, and the last 10% relates to a consumer's credit mix or the different types of debts reported.

45. Payment history refers to whether a consumer has paid their bills in the past, on time, late or missed payments. The more severe, recent, and frequent the late payment information, the greater the impact on a FICO Score. Public record items such as bankruptcy, foreclosure, judgments, and wage garnishments are also considered part of a consumer's payment history.

46. In factoring the severity of delinquent payments a FICO Score considers how late the payment continues to be, how much is owed, how recently this occurred, and how many delinquent accounts exist.

47. Once a delinquent account has been remedied the longer the account stays current the more a consumer's FICO Score should increase.

48. FICO Scores are entirely dependent upon information provided by Data Furnishers ("DFs") to CRAs.

49. The FICO scoring formula treats both Chapter 7 and Chapter 13 Bankruptcies similarly in terms of their impact on one's FICO Score. Specifically, both "Chapters" have the same level of severity with respect to their FICO Score and for both, FICO uses the FILING DATE to determine how long ago the bankruptcy took place.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

### b. Metro 2

50. The Consumer Data Industry Association ("CDIA") is an international trade association representing the consumer credit, mortgage reporting, employment and tenant screening and collection service industries.

51. The credit reporting industry has adopted a standard electronic data reporting format called the Metro 2 format. The Metro 2 format was developed by the CDIA in an effort to universally report debts in a particular manner that is understood to be the most accurate way in which to report a debt. Specifically, Metro 2 format was designed to allow reporting of the most accurate and complete information on consumers' credit history.

52. The Consumer Data Industry Association's ("CDIA") Metro 2 format is *The* credit industry's standardized, objective reporting format used by furnishers to provide information about consumer accounts to consumer reporting agencies.[1]

53. Therefore, the credit reporting industry at large depends upon Metro 2 and the CDIA's recommendations for reporting debt accurately.

54. The CDIA is *The* expert on accurate credit reporting. In support of this allegation, Plaintiff avers the following:

    a. The CDIA offers an FCRA certificate program for all CRAs

    b. The CDIA offers an FCRA awareness program for all CRAs.

    c. The CDIA offers an FCRA certificate program for DFs.

    d. The CDIA offers an FCRA awareness program for DFs.

    e. The CDIA offers a Metro 2 Learning system to provide detailed instructions on the use of Metro 2 format to ensure understanding of the reporting guidelines for each field of the Metro 2 Format as well as the relationship between multiple fields.

---

[1] *See* Consumer Financial Protection Bureau, Key Dimensions and Processes in the U.S. Credit Reporting System, available at: http://files.consumerfinance.gov/f/201212_cfpb_credit-reporting-white-paper.pdf

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

f.  The CDIA hosts workshops developed and authorized by Equifax, Experian, Innovis, and TransUnion.

g.  The CDIA developed a credit reporting resource guide for accurately reporting credit.

55.  The CDIA's Metro 2 is accepted by all CRAs.

56.  The credit reporting accepted industry standards for reporting Metro 2 accurately are found in the CDIA's Credit Reporting Resource Guide ("CRRG").

57.  The CRRG outlines the industry standards for most accurately reporting debts using Metro 2.

58.  The CRRG is not readily available to the public. It can be purchased online for approximately $229.45.

59.  Even if a buyer is ready and able to pay for the CRRG, the CDIA will NOT grant access to the guide unless the buyer represents an organization included in the Metro 2 Access Policy.

60.  When FICO calculates credit scores the algorithms use Metro 2 information based on industry standards established by the CDIA.

61.  The algorithms used by FICO in determining a consumer's credit score are premised on the Metro 2 data received comporting with the CDIA's recommendations for accurate credit reporting.

62.  If the Metro 2 data received by FICO deviates from industry standards an inaccurate or incorrect FICO Score results. If the resulting FICO Score is lower, a consumer will be considered a higher credit risk, resulting in less favorable lending terms.

**c.  e-Oscar**

63.  E-OSCAR is the web based Metro 2 compliant system developed by the CRAs that enables DFs and CRAs to create and respond to consumer credit disputes.

64. When a consumer sends a dispute letter to a CRA, the CRA then sends an automated credit dispute verification ("ACDV") via e-Oscar to the DF.

65. The ACDV contains within it Metro 2 codes next to certain data fields associated with a credit file, e.g. "Account Type - 07" (07 in Metro 2 refers to a Charge Account).

**d. Bankruptcy Credit Reporting Industry Standards & Consumer Information Indicator ("CII")**

66. When a consumer files bankruptcy, certain credit reporting industry standards exist.

67. Certain Metro 2 data is regularly expected and calculated by FICO when determining a consumer's credit worthiness.

68. The Consumer Information Indicator ("CII") is a critical field in the Metro 2 Format that indicates a special condition that applies to a specific consumer.

69. Under Metro 2, the CII must be reported only on the consumer to whom the information applies.

70. It is the credit reporting industry standard to report a very specific CII upon the occurrence of critical events during a consumer bankruptcy, such as the filing of the bankruptcy and the bankruptcy discharge.

71. In a consumer bankruptcy context, CII Metro 2 Code "A" denotes that a petition for Chapter 7 has been filed, is active, but no discharge has been entered.

72. CII Metro 2 Code "D" indicates that a Chapter 13 petition has been filed, is active, but no discharge has been entered. This is usually translated on a consumer credit report as "Wage Earner Plan" or "WEP" in the "Account Status" portion of a trade line. Such reporting alerts end users, including potential creditors, that the account is no longer subjected to its pre-bankruptcy terms, but rather is being handled by a Chapter 13 trustee.

73. CII Metro 2 Code "Z" indicated that a bankruptcy petition has been filed but the chapter is undesignated/unknown.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

74. CII Metro 2 Code "E" denotes that a Chapter 7 bankruptcy has been discharged.

75. CII Metro 2 Code "H" denotes that a Chapter 13 bankruptcy has been discharged.

76. The CII field is a critical field for consumers and directly relates to and impacts a consumer's credit worthiness.

77. The lack of an accurate reporting of the CII field makes it appear that a consumer has not addressed outstanding debt obligations through the bankruptcy process.

78. The lack of an accurate reporting of the CII field also suggests that creditors are free to collect against a consumer per their pre-bankruptcy contract terms, which is inaccurate and materially misleading due to the effect of the bankruptcy orders, such as the automatic stay of section 362 of Title 11, that exist to prevent post-petition collection activity, the order confirming the chapter 13 plan, and the discharge order which enjoins post-discharge collection upon any *in personam* liability for a claim.

79. Accordingly, failure to report the correct CII indicator would prompt those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

80. Under the FCRA, a bankruptcy can be reported for ten years.

81. The ten-year rule for reporting runs from the date the bankruptcy was *filed*.

82. A consumer's FICO Score is directly related to the date on which a petition is filed and acknowledged.

83. The more time that has passed since the filing of the bankruptcy, the less negative impact the bankruptcy will have on a consumer's FICO Score.

84. Failure to reference the bankruptcy filing and/or discharge in the CII field and/or the correct petition date shall result in a lower FICO Score resulting in those making credit decisions to draw a more negative inference regarding a consumer's credit worthiness.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

85. As explained in more detail below, Defendants failed to reference the bankruptcy filing and/or discharge in the CII field in Plaintiff's Credit Reports in respect to multiple consumer accounts successfully discharged through Plaintiff's Chapter 13 Bankruptcy.

86. Instead, Defendants reported that the *current* (pay) status of the debts were delinquent, "Charged Off" i.e. still legally collectable, "Past Due", or otherwise still legally owed in their pre-Bankruptcy form with outstanding balances owing as opposed to "Discharged/included in Bankruptcy" with a $0 balance.

87. The failure to report the correct status of "Discharged in Bankruptcy" with a $0 balance owed inaccurately and misleadingly suggested that Plaintiff still has a personal legal liability to pay the alleged Debt, which is the opposite effect of receiving a Chapter 13 bankruptcy discharge.

### GENERAL ALLEGATIONS

88. At all times relevant to this matter, Plaintiff was an individual residing within the State of California.

89. Furthermore, Defendants conducted business within the State of California at all times relevant.

90. On or about March 13, 2012, Plaintiff filed for a Chapter 13 bankruptcy in the United States Bankruptcy Court for the Eastern District of California in Sacramento. Plaintiff's case was assigned Case Number 12-24844 (the "Bankruptcy").[2]

91. The obligations ("Debt") to Furnisher-Defendants were scheduled in the Bankruptcy.

///

///

---

[2] The District Court has discretion to take judicial notice of the documents electronically filed in the bankruptcy case. *See*, *Atwood v. Chase Manahttan Mortg. Co.* (*In re Atwood*), 293 B.R. 227, 233 n.9 (B.A.P. 9th Cir.2003).

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

92. Furnisher-Defendants each received a copy and notice of the Bankruptcy filing on or about March 13, 2012 through a Court Certificate of Mailing with Service by the Bankruptcy Noticing Center.

93. Furnisher-Defendants did not have their Debt ordered to be "non dischargeable" pursuant to 11 U.S.C. § 523 *et seq*.

94. Furnisher-Defendants also did not receive relief from the "automatic stay" codified at 11 U.S.C. §362 *et seq*. while the Plaintiff's Bankruptcy was pending to pursue the Plaintiff for any of the underlying Debts in their pre-bankruptcy form.

95. Further, after the Bankruptcy is filed, it is illegal and inaccurate for creditors to report any post-Bankruptcy derogatory collection information, which would be inconsistent with the Bankruptcy Orders entered by the Bankruptcy Court, including the initial Petition for Relief for Bankruptcy protection, the automatic stay, the confirmed Chapter 13 Bankruptcy Wage Earner Repayment Plan (the "Plan"), and the Discharge Order (collectively the "Bankruptcy Orders").

96. After Plaintiff filed for a Chapter 13 Bankruptcy, she immediately began making monthly payments to the Bankruptcy Trustee.

97. The Bankruptcy Trustee represented Plaintiff's creditors (including Furnisher-Defendants), and was responsible for collecting payments on behalf of Plaintiff's creditors from Plaintiff and, in turn, disbursing those payments amongst Plaintiff's creditors according to the terms of the confirmed Plan.

98. Plaintiff filed her modified Plan on or about January 25, 2013, and Furnisher-Defendants received a copy of the proposed Plan by first class mail from the Bankruptcy Noticing Center on or about January 25, 2013.

99. Plaintiff's Plan was officially confirmed on or about April 17, 2013.[3]

---

[3] "The provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan."   11 U.S.C. § 1327(a).

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

100. Once the Bankruptcy Court confirms a Chapter 13 Repayment Plan, a "new contract" is confirmed between a debtor and their creditors included in the Plan, and any pre-repayment plan contracts/obligations to that debtor's creditors are subject to the new repayment obligation confirmed by the Bankruptcy Court.

101. In short, the confirmed Chapter 13 Plan is the new contract to be enforced between debtors and creditors.

102. The terms of the Plan were for Plaintiff to make payments to the Trustee of $175 per month and that the obligations due to Furnisher-Defendants under the Plan would be satisfied over the 36-60 month period of the Plan.

103. Further, the Bankruptcy Court entered a "Notice of Filed Claims" Order on December 14, 2012, which delineated every proof of claim submitted by Plaintiff's creditors, the amount owing for each claim, the percentage of the amount owed for each claim that would be discharged following Plaintiff's successful completion of the Plan, the classification of each claim's Debt (e.g. unsecured, secured, etc.), and describes the sequence in which payments will be made to creditors by the trustee.[4]

104. Any Furnisher-Defendants who timely submitted proof of claims through Plaintiff's Bankruptcy were paid pursuant to the terms of the Plan and Notice of Filed Claims.

105. In the credit reporting context, in a Chapter 13 Repayment Plan, the Furnisher-Defendants who submitted proofs of claims through Plaintiff's Bankruptcy were paid on time as long as Plaintiff paid $175 per month to the Bankruptcy Trustee.

///

///

---

[4] The standing chapter 13 trustee is required to, "dispose of, under regulations issued by the Director of the Administrative Office of the United States Courts, moneys received or to be received" and "distribute any such payment in accordance with the plan as soon as is practicable".  11 U.S.C. §§ 1302, 1326.

106. Any Furnisher-Defendants included in the Bankruptcy who failed to submit proofs of claims through Plaintiff's Bankruptcy forwent all payments to them through the Plan, and, post-discharge, extinguished any personal obligation Plaintiff had before filing the Bankruptcy to repay them.

107. In the credit reporting context, in a Chapter 13 Repayment Plan, the Furnisher-Defendants who failed to file a proof of claim in the Bankruptcy waived the right to report a debt as not paid on time through the Trustee's distributions.

108. If Plaintiff failed to consistently make the necessary repayment payments to the Bankruptcy Trustee every month, then the Bankruptcy would have been in danger of being dismissed, rather than towards the path of a successful discharge.

109. However, Plaintiff followed the terms of her Bankruptcy Plan by consistently making the necessary payments to her Bankruptcy Trustee nearly every month for approximately three years.

110. In other words, Plaintiff fully executed her statutory obligation to make Plan payments to the Trustee, who acted to collect on behalf of Furnisher-Defendants and made distributions according to Plaintiff's obligations.

111. On or about May 26, 2015, the Bankruptcy Trustee filed the "Chapter 13 Standing Trustee's Final Report and Account", which reflected that Plaintiff made all payments required through the Plan. Furnisher-Defendants received notice of this report by first class mail from the Bankruptcy Noticing Center on or about May 26, 2015.

112. Plaintiff's Bankruptcy successfully discharged on August 24, 2015.

113. Accordingly, the Debt to Furnisher-Defendants was discharged through the Bankruptcy and Furnisher-Defendants received notice of the successful discharge from the Bankruptcy Noticing Center on or about August 24, 2015.

///

///

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

114. Again, after the Bankruptcy is filed, it is illegal and inaccurate for creditors to report any post-Bankruptcy derogatory collection information, which would be inconsistent with the Bankruptcy Orders entered by the Bankruptcy Court, including the initial Petition for Relief for Bankruptcy protection, the automatic stay, the confirmed Bankruptcy Plan, and the Discharge Order.

115. However, Furnisher-Defendants reported or caused to be reported inaccurate information after the Bankruptcy was filed on Plaintiff's credit reports.

116. Furnisher-Defendants attempted to collect upon their respective Debt by reporting post-Bankruptcy derogatory information on Plaintiff's credit report(s), that was inconsistent with the Bankruptcy Orders, which is an illegal collection activity, was therefore inaccurate and materially misleading under the FCRA/CCRAA and even prohibited by the automatic stay and discharge.

117. Furnisher-Defendants' reporting of post-Bankruptcy derogatory information was inaccurate in that Furnisher-Defendants continued reporting information based on Furnisher-Defendants' pre-bankruptcy contract terms with the Plaintiff, which were no longer enforceable upon the bankruptcy filing and confirmation of the Bankruptcy Plan, thereby rendering the disputed information inaccurate and materially misleading.

118. Furnisher-Defendants' reporting of post-Bankruptcy derogatory information was also inaccurate because a default on an account included in a bankruptcy can occur no later than the bankruptcy filing date, at which point the accounts included in the Bankruptcy were no longer legally collectable in their pre-Bankruptcy form due to the effect of the automatic stay, confirmed plan, and successful discharge. Thus, by reporting post-Bankruptcy derogatory information, Furnisher-Defendants made Plaintiff's pre-Bankruptcy Debt appear more recently subject to collection than it really was, which is inaccurate and materially misleading.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

119. Even if reporting debts in their pre-bankruptcy form during the life of the Chapter 13 Plan was accurate, which it was not, failing to report payments made to the Bankruptcy Trustee every month, which was in turn disbursed amongst Plaintiff's creditors, was inaccurate and materially misleading because doing so would lower the amount of the debt owed even in its pre-bankruptcy form.

120. Moreover, the post-Bankruptcy derogatory, delinquent information furnished by Furnisher-Defendants after Plaintiff filed the Bankruptcy was inaccurate and materially misleading because end users, including potential creditors, would interpret delinquencies on accounts after Plaintiff filed for the Bankruptcy to mean that Plaintiff was being noncompliant with her repayment obligations through the Bankruptcy Plan, and her bankruptcy was at risk of being dismissed, rather than towards the path of a successful discharge.

121. Further, the Consumer Data Industry Association's ("CDIA") Metro 2 format is the credit industry's standardized, objective reporting format used by furnishers to provide information about consumer accounts to consumer reporting agencies.[5]

122. Upon information and belief, Furnisher-Defendants have adopted the *Metro 2 Format Manual* as its standard instruction book in respect to credit reporting.

123. Specifically, the Metro 2 Format guidelines for credit reporting instruct furnishers to report a CII current account status of "Petition for Chapter 13 Bankruptcy" during the month the bankruptcy is filed, during the months between the petition and the bankruptcy plan is confirmed, and during the month the plan is confirmed.

///

///

---

[5] *See* Consumer Financial Protection Bureau, Key Dimensions and Processes in the U.S. Credit Reporting System, available at: http://files.consumerfinance.gov/f/201212_cfpb_credit-reporting-white-paper.pdf

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

124. Once the bankruptcy plan is completed, i.e. all payments are made according to the bankruptcy plan, Metro 2 Format guidelines instruct furnishers to report a CII current account status of "Discharged/completed through BK Chapter 13."

125. Furnishers are also instructed to report the value indicator "D", i.e. "no data", in the "Payment History" section for the months between the bankruptcy petition is filed and there is a confirmed plan, after the confirmation of the plan, and after the plan is completed.

126. Further, once the Plan is confirmed furnishers are instructed to report the Chapter 13 Plan balance as the "Current Balance", to report the "Amount Past Due" as "Zero", not report the account as delinquent[6], and to report the Plan amount for the "Scheduled Monthly Payment Amount."

127. If a Plan does not call for payments to be made on a particular debt, the accurate credit reporting standard is to report a $0.00 current balance.

128. The "Current Balance" should decrease over the course of the Plan as payments are made from the Bankruptcy Trustee to Creditors.

129. Once the Plan is successfully completed, furnishers for accounts included in the bankruptcy are instructed to report the CII status as "Discharged/completed through BK Chapter 13", report "Current Balance", "Scheduled Monthly Payment Amount", and "Amount Past Due" as "Zero" (i.e. $0), and continue reporting "D", i.e. "no data", in the "Payment History" section.

///

///

---

[6] *In re Luedtke*, 2008 WL 2952530 (Bankr. E.D. Wis. July 31, 2008) (noting that debtors sometimes use chapter 13 plans to establish a track record of payments to rehabilitate their credit records, and allowing reporting of account as delinquent is contrary to spirit and purpose of chapter 13). *Cf. In re Burkey*, 2012 WL 5959991 (Bankr. N.D.N.Y. Nov. 28, 2012) (provisions of confirmed plan bind the creditor, but creditor can report delinquencies on co-debtor's credit report, since plan did not alter co-debtor's liability under the loan).

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

130. However, for secured debts that consumers continue to make payments on following the completion of the Bankruptcy Plan, such as Plaintiff's mortgage accounts with WFBNA and SLS, furnishers are instructed to update: (1) the Account Status that applies (e.g. "Current"); (2) the Payment History; (3) the Current Balance (i.e. Outstanding balance amount); (4) Scheduled Monthly Payment Amount; and (5) Amount Past Due to the proper status/amount that applies.

131. The CDIA and credit reporting industry recognize that allowing creditors to continuously report ongoing delinquencies and past due balances post confirmation of the Plan would objectively make filing Chapter 13 and repaying creditors exponentially worse for a consumer's credit worthiness as opposed to filing Chapter 7. Thus, deviation from the aforementioned credit reporting industry standards shall result in a more negative inference being drawn with respect to a consumer's credit worthiness.

132. Upon information and belief, Plaintiff alleges that Furnisher-Defendants voluntarily choose to choose to subscribe to the Metro 2 format in their credit reporting practices to credit reporting agencies, but did not comply with the Metro 2 reporting standards in respect to Plaintiff's accounts.

133. End users, including potential creditors, would have thus expected Furnisher-Defendants to report in compliance with the Metro 2 format.

134. Potential creditors familiar with Furnisher-Defendants' standard credit reporting methods would be misled by seeing Furnisher-Defendants reporting derogatory delinquencies in respect to the Debt to believe that Plaintiff incurred new debt during the Bankruptcy or that Plaintiff reaffirmed the debt notwithstanding the discharge because Furnisher-Defendants' reporting deviated from Metro 2 reporting instructions in these respects.

135. However, Plaintiff did not incur new debt with Furnisher-Defendants during the Bankruptcy proceeding or reaffirm the Debt in the Bankruptcy.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

136. Accordingly, by reporting post-Bankruptcy delinquent and derogatory information, Furnisher-Defendants did not comply with the Metro 2 format.

137. Even if Furnisher-Defendants reported accurately elsewhere in the same account tradeline to the Credit Bureaus that, for example, the Debt was "discharged in the Bankruptcy," such reporting would be patently inconsistent, confuse potential creditors, and thus, be inherently inaccurate and materially misleading.

138. Furnishers utilizing the Metro 2 reporting standard correctly is crucial because the Metro 2 system creates a uniform standard for the meaning given to each field provided, which fosters consistency in how furnishers formulate data to report to the credit bureaus, which ultimately leads to objective credit evaluations and scores for consumers.

139. Moreover, the FCRA and CCRAA impose no requirement or mandate that a furnisher provide any information to a consumer reporting agency. Indeed, the CDIA has repeatedly noted that the act of furnishing information to a consumer reporting agency is completely voluntary.[7]

140. Accordingly, once Plaintiff filed the Bankruptcy and the Bankruptcy Plan was confirmed by the Bankruptcy Court's Order, Furnisher-Defendants were required to report accurately according to the terms of Plaintiff's confirmed Plan to the consumer reporting agencies or not report Plaintiff's accounts at all.

///
///
///
///

_____

[7] *See, e.g.,* Credit Reports: Consumers' Ability to Dispute and Change Inaccurate Information: Hearing Before the H. Comm. on Fin. Serv., 110 Congr. 50 (2007) (written statement of Stuart Pratt, President and CEO, Consumer Data Industry Association) ("not a single one of the more than 18,000 data furnishers has to provide a single record of data to our members").

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

141. Upon information and belief, Plaintiff alleges that Furnisher-Defendants did not comply with the Metro 2 reporting standards in respect to Plaintiff's accounts and reported inaccurately by failing to comport their reporting practices with the terms of the Bankruptcy Plan and Plaintiff's participation in the Bankruptcy Plan.

142. Accordingly, Furnisher-Defendants' non-compliance with the Metro 2 reporting standards constitutes an inaccurate and materially misleading statement under the FCRA and CCRAA, because a furnisher that fails to comply with the uniform and objective Metro 2 reporting standards compromises the credit reporting system.

143. Because credit reporting is a voluntary act, Furnisher-Defendants' deviation from the Metro 2 format instructions—the industry standard and their respective chosen method of reporting—constitutes an inaccurate or misleading statement. This is because those making credit decisions, who would expect that furnishers like Furnisher-Defendants would adhere to the Metro 2 format, would view the reporting of accounts included in the Bankruptcy in their delinquent pre-bankruptcy form more negatively than if the accounts reported accurately.

144. In other words, Furnisher-Defendants' failure to adhere to the Metro 2 format would prompt those making credit decisions to draw a more negative inference from Furnisher-Defendants' reporting and, in turn, be less likely to approve Plaintiff for an extension of credit.

145. Plaintiff subsequently learned that Furnisher-Defendants reported inaccurate credit information regarding the status and treatment of Plaintiff's obligations to them on Plaintiff's credit reports after Plaintiff's Bankruptcy filing, after Plaintiff's Bankruptcy Plan was confirmed by the bankruptcy court, and after Plaintiff's Bankruptcy discharge, thereby causing erroneous and negative credit information in Plaintiff's credit files and damaging Plaintiff's creditworthiness.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

146. In respect to their FCRA investigations, Plaintiff alleges Furnisher-Defendants, rather than train its employees how to properly review and investigate disputes, are generally expected to simply confirm whatever information being reported is accurate, rather than conducting an actual reasonable investigation.

147. Similarly, Plaintiff alleges the Credit Bureaus' employees have a policy of simply parroting whatever information is provided by furnishers rather than conducting reasonable reinvestigations under the FCRA and CCRAA.

148. This is because the investigation and reinvestigations conducted by the Furnisher-Defendants and Credit Bureaus, respectively, occur in a hurried, conveyor-belt styled atmosphere in which dispute operators are under pressure to process disputes quickly to meet production quotas. This atmosphere is conducive to a speed-minded dispute operator failing to consider, or not looking for, information that is relevant to the consumer's dispute.

149. Such conduct by Defendants is willful and reckless.

150. Furthermore, the Credit Bureaus' policies and procedures for maintaining and operating their internal databases were not reasonable, because they continued reporting patently inaccurate and materially misleading information after Plaintiff formally disputed the reporting. Accordingly, the Credit Bureaus failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff and violated 15 U.S.C. § 1681e(b) and Cal. Civ. Code §1785.14(b).

151. As a direct and proximate result of the derogatory information furnished and reported by Defendants, Plaintiff has sustained actual damages including emotional distress, having her privacy invaded, humiliation, embarrassment, anxiety, loss of sleep, defamation of character, pain and suffering, damages to her credit rating, damages to his creditworthiness, and she was impeded in her ability to obtain credit. Plaintiff has abstained from applying from credit in fear of being denied due to Defendants' inaccurate reporting.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

152. As a further direct and proximate result of Defendants' acts stated herein, Plaintiff has spent many hours and associated costs reviewing credit reports, disputing the incorrect information furnished by Defendants via certified mail, and incurred attorneys' fees and such further expenses in an amount to be determined at trial.

### WFBNA INACCURATE AND MATERIALLY MISLEADING CREDIT INFORMATION RE: ACCOUNT NO.: 446542019699...

153. In an Experian Credit Report dated August 18, 2017, WFBNA reported the following inaccurate, misleading, and derogatory information for the above-referenced account number:

- Pay Status: Open. $4,342 past due as of Aug 2017
- Recent Balance: $4,342 as of Aug 2017
- Payment History: 180 Days Delinquent February 2012 to October 2013; Charged Off November 2013 to July 2017; and 180 Days Delinquent as of August 2017
- Account Balances of $4,342 from August 2015 to July 2017.

154. There was also no notation, status update, or any other indication in the tradeline as it was reported to Experian that this WFBNA account was included in or discharged in Plaintiff's Bankruptcy.

155. WFBNA filed a proof of claim for $4,434.79 in Plaintiff's Bankruptcy.

156. According to the Bankruptcy Trustee's Final Report and Account (entered on May 26, 2015), WFBNA's Debt was "unsecured" and over the course of the Plan, Plaintiff paid $92.19 towards this debt, while the remaining amount was scheduled for discharge because Plaintiff successfully completed the terms of the Plan.

157. WFBNA received electronic notice of this report through the Bankruptcy Noticing Center on or about May 26, 2015.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

158. It was inaccurate and materially misleading for WFBNA to report the above derogatory delinquencies related to Plaintiff's pre-Bankruptcy obligations after March 13, 2012, because Plaintiff filed for Bankruptcy on March 13, 2012, at which point the automatic stay went into effect and severed WFBNA's ability to enforce Plaintiff's purported pre-Bankruptcy obligations against Plaintiff personally in their pre-bankruptcy form.

159. Moreover, the above adverse information was also inaccurate and materially misleading because the Bankruptcy Plan (i.e. the new contract between Plaintiff and WFBNA) determined how WFBNA would be paid. Failing to report consistent with the terms of the Bankruptcy Plan was therefore inaccurate and materially misleading.

160. Accordingly, if WFBNA chose to continue reporting on Plaintiff's credit reports, WFBNA was required to report accurately according to Plaintiff's participation in the Bankruptcy Plan.

161. Yet WFBNA failed to accurately report according to Plaintiff's participation and payments stemming from the Bankruptcy Plan, making WFBNA's reporting inaccurate and materially misleading under the FCRA and CCRAA.

162. It was inaccurate and materially misleading for WFBNA to report the above balance amounts because Plaintiff no longer had an obligation owing on the account following her successful bankruptcy discharge. As mentioned, the legal impact of the bankruptcy was reflected in Metro 2 instructions dictating bureaus and furnishers to report a balance of $0 for unsecured accounts.

163. The "Charge Off" and past due status notations by WFBNA during the life of the Plan *and* post-discharge inaccurately and misleadingly suggested that Plaintiff was being delinquent on his repayment obligations to WFBNA, which was not true.

///

///

164. Moreover, the post-Bankruptcy derogatory, delinquent information furnished by WFBNA after Plaintiff filed the Bankruptcy was inaccurate and materially misleading because end users, including potential creditors, would interpret the delinquencies to mean that Plaintiff was being noncompliant with her repayment obligations during the Bankruptcy Plan, which was not true.

165. Plaintiff followed the terms of her Bankruptcy Plan by consistently making the necessary payments to her Bankruptcy Trustee nearly every month for approximately three years.

166. Therefore, Plaintiff was not delinquent on the WFBNA account during the pendency of the Bankruptcy, and it was inaccurate and materially misleading for WFBNA to report that Plaintiff was delinquent after the Bankruptcy.

167. Accordingly, pursuant to the terms of the Bankruptcy Orders and the Metro 2 reporting standards discussed, it was inaccurate and materially misleading for WFBNA to report delinquencies following Plaintiff's Bankruptcy filing and discharge.

168. Again, the Bankruptcy Court confirmed that Plaintiff successfully completed the Plan and entered a "Discharge of Debtor After Completion of Chapter 13 Plan" Order on August 24, 2015.

169. Accordingly, any remaining Debt to WFBNA not paid over the life of the Plan was discharged through the Bankruptcy and WFBNA received notice of the successful discharge through the Bankruptcy Noticing Center on or about August 24, 2015 by first class mail through the Bankruptcy Noticing Center.

170. Rather than using the bankruptcy information sent specifically to WFBNA, which WFBNA knew or should have known existed, WFBNA continued reporting inaccurately on Plaintiff's credit reports.

171. WFBNA's credit reporting information is relevant to Plaintiff's credit score, and WFBNA's inaccurate reporting is materially misleading and therefore adversely affects Plaintiff's creditworthiness.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

172. Therefore, WFBNA's inaccurate, materially misleading, and negative reporting of the Debt in light of their knowledge of the Bankruptcy was willful.

173. Through this conduct, WFBNA has violated Cal. Civ. Code § 1785.25(a) by furnishing information to Experian that WFBNA knew or should known was inaccurate and materially misleading.

**WFBNA INACCURATE AND MATERIALLY MISLEADING CREDIT INFORMATION RE: ACCOUNT NO.: 708008164* (THE "ACCOUNT")**

174. In an TransUnion Credit Report dated August 18, 2017, WFBNA reported the following inaccurate, misleading, and derogatory information for the above-referenced Account:

- Maximum Delinquency of 120 days in 04/2014 and 08/2014

175. Upon information and belief, Plaintiff disputes the reporting that she was delinquent on the WFBNA mortgage account. Therefore, WFBNA's reporting was inaccurate and materially misleading. Plaintiff continues to pay WFBNA her monthly mortgage payments.

176. On or about December 2017, Plaintiff disputed WFBNA's reported information regarding the Debt pursuant to 15 U.S.C. § 1681I(a)(2) by notifying TransUnion, in writing, of the incorrect and inaccurate credit information furnished by WFBNA.

177. Specifically, Plaintiff sent a letter, via certified mail, to TransUnion (the "Dispute Letter"), stating the following:

> This account is a home mortgage account that I am continuing to make payments on following my Chapter 13 Bankruptcy, which was filed on 03/13/2012 and discharged on 08/24/2015, bearing docket        No.12-24844-B-13J in the  Eastern District of California (Sacramento). I am current on this account and make timely payments every month. Accordingly, the status should be reporting as "current", "pays as agreed", or the equivalent. Moreover, the history of the account should reflect all of my timely payments for the last seven years.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

Remove <Maximum Delinquency of 120 days in 04/2014 and 08/2014<

178. The Dispute Letter further requested that TransUnion:

- Immediately delete the disputed derogatory information from my credit report and update my credit report accordingly.

- If you do not immediately correct the disputed information on my credit report, please include the "Consumer Dispute" section above as my dispute statement for this account on my credit report.

179. Upon information and belief, TransUnion timely notified WFBNA of Plaintiff's dispute, but they both continued reporting inaccurate, derogatory information.

180. WFBNA was required to conduct a reasonable investigation into this specific account on Plaintiff's consumer report pursuant to 15 U.SC. § 1681s-2(b)(1)(A).

181. TransUnion was required to conduct a reasonable reinvestigation into this specific account on Plaintiff's consumer report pursuant to 15 U.S.C. §1681i and Cal. Civ. Code §1785.16.

182. On or about January 2018, Plaintiff received notification from TransUnion and WFBNA received notice of Plaintiff's dispute pursuant to 15 U.S.C. § 1681i(a)(6) and were providing the results of their (re)investigation.

183. However, rather than remove the above derogatory information from Plaintiff's report, TransUnion and WFBNA simply left derogatory information on Plaintiff's report.

184. Specifically, TransUnion and WFBNA reported the following inaccurate and derogatory information on Plaintiff's credit in respect to the Account:

- Current Status – Account Included in Bankruptcy

///

///

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

185. WFBNA and TransUnion's inaccurate reporting of bankruptcy notations associated with the account and failure to report Plaintiff's payment history, despite Metro 2 instructions indicating otherwise, caused the Account to automatically be placed in the "negative" or "adverse" sections of Plaintiff's credit report, which negatively impacted Plaintiff's creditworthiness.

186. Pursuant to the above-delineated Metro 2 reporting instructions WFBNA and TransUnion voluntarily subscribe to, the complete and accurate reporting of the Account following the completion of Plaintiff's Bankruptcy would have reflected the following: (1) the Account Status should have reported as "Current", "Pays as Agreed", or the equivalent; and (2) the Payment History should have reflected Plaintiff's timely payments for the last seven years.

187. This inaccurate and materially misleading credit reporting information is relevant to Plaintiff's FICO credit score and therefore adversely affects Plaintiff's creditworthiness.

188. Equifax did not provide notice to Plaintiff that her dispute was "frivolous or irrelevant," pursuant to 15 U.S.C. § 1681i(a)(3) or included Plaintiff's "Statement of Dispute" pursuant to 15 U.S.C. § 1681i(b).

189. Moreover, upon information and belief, the TransUnion's reinvestigation was not reasonable. More specifically, TransUnion should have discovered from its records, including Plaintiff's official dispute letter, that the information WFBNA was reporting was inaccurate and materially misleading. TransUnion could have easily requested WFBNA to provide Plaintiff's payment records, which would have reflected Plaintiff was still making payments on the secured debt obligation following Plaintiff's Bankruptcy and was current on the Account for years.

190. Accordingly, TransUnion failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff and violated 15 U.S.C. § 1681e(b) and Cal. Civ. Code §1785.14(b).

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

191. Accordingly, TransUnion failed to conduct a reasonable reinvestigation with respect to the disputed information as required by 15 U.S.C. §1681i and Cal. Civ. Code §1785.16.

192. Upon information and belief, WFBNA's investigation was also not reasonable. More specifically, WFBNA should have discovered from its records, including Plaintiff's official dispute letter, that the information WFBNA was reporting was inaccurate and materially misleading. Specifically, WFBNA could have simply reviewed Plaintiff's Account with them and recognized that the correct, current status of Plaintiff's Account was current and in good standing for years. WFBNA could have also consulted with and conformed their credit reporting to properly follow Metro 2 reporting instructions.

193. Accordingly, WFBNA failed to conduct a reasonable investigation with respect to the disputed information as required by 15 U.SC. § 1681s-2(b) by:

    a. Failing to remove all of the disputed and incorrect information;

    b. Failing to update Plaintiff's Account (history); and

    c. Failing to notate, as required, Plaintiff's dispute.

194. Through this conduct, WFBNA has violated Cal. Civ. Code § 1785.25(a) by furnishing information to TransUnion, i.e. consumer reporting agencies, that WFBNA knew or should known was inaccurate and materially misleading.

195. WFBNA and TransUnion failed to review all relevant information provided by Plaintiff in the dispute to Equifax as required by and in violation of 15 U.SC. § 1681s-2(b)(1)(B).

196. Due to WFBNA and TransUnion's failure to reasonably (re)investigate, they each further failed to correct and update Plaintiff's information as required by 15 U.S.C. § 1681s-2(b)(1)(E), thereby causing continued reporting of inaccurate information in violation of 15 U.S.C. § 1681-s(2)(b)(1)(C).

///

///

197. Plaintiff's continued efforts to correct WFBNA and TransUnion's erroneous and negative reporting of the Debt by communicating Plaintiff's dispute with WFBNA and TransUnion were fruitless.

198. WFBNA and TransUnion's continued inaccurate and negative reporting of the Debt in light of its knowledge of the actual error was willful.

199. WFBNA and TransUnion's failure to correct the previously disclosed inaccuracies on Plaintiff's credit report was intentional and in reckless disregard of its duty to refrain from reporting inaccurate information. Accordingly, WFBNA and TransUnion willfully and negligently failed to comply with its duty to reasonably investigate Plaintiff's dispute.

200. WFBNA and TransUnion's inaccurate and negative reporting damaged Plaintiff's creditworthiness.

201. By inaccurately reporting account information relating to the Debt after notice and confirmation of its errors, WFBNA and TransUnion failed to take the appropriate measures as determined in 15 U.S.C. §§ 1681-s(2)(b)(1)(D) and (E).

**SLS INACCURATE AND MATERIALLY MISLEADING CREDIT INFORMATION RE: ACCOUNT NO.: 101130\* (THE "ACCOUNT")**

202. In an Equifax Credit Report dated August 18, 2017, SLS reported the following inaccurate, misleading, and derogatory information for the above-referenced Account:

- Current Status – Included in Wage Earner Plan

203. SLS's inaccurate reporting of bankruptcy notations associated with the account caused the account to automatically be placed in the "negative" or "adverse" section of Plaintiff's credit report, which negatively impacted Plaintiff's creditworthiness.

///

///

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

204. Pursuant to the above-delineated Metro 2 reporting instructions SLS voluntarily subscribes to, the complete and accurate reporting of the Account following the completion of Plaintiff's Bankruptcy would have reflected the following: (1) the Account Status should have reported as "Current", "Pays as Agreed", or the equivalent; and (2) the Payment History should have reflected Plaintiff's timely payments for the last seven years.

205. This inaccurate and materially misleading credit reporting information is relevant to Plaintiff's FICO credit score and therefore adversely affects Plaintiff's creditworthiness.

206. Despite receiving timely, monthly payments from Plaintiff ever since SLS obtained servicing rights to the Account, SLS furnished information that it knew or should have known to be incomplete or inaccurate in such a way that would be materially misleading and thereby adversely affect credit decisions. Plaintiff continues to pay SLS her monthly mortgage payments.

207. Therefore, SLS's inaccurate, materially misleading, and negative reporting of the Debt in light of their knowledge that Plaintiff was current on the Account was willful.

208. Through this conduct, SLS has violated Cal. Civ. Code § 1785.25(a) by furnishing information to Equifax, i.e. a consumer reporting agency, that SLS knew or should known was inaccurate and materially misleading.

209. On or about December 2017, Plaintiff disputed SLS's reported information regarding the Debt pursuant to 15 U.S.C. § 1681I(a)(2) by notifying Equifax, in writing, of the incorrect and inaccurate credit information furnished by SLS.

210. Specifically, Plaintiff sent a letter, via certified mail, to Equifax (the "Dispute Letter"), requesting the above inaccurate information be corrected/deleted because the client was current on the Account following the Bankruptcy and had been making timely payments for years.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

211. The Dispute Letter further requested that Experian:

- Immediately delete the disputed derogatory information from my credit report and update my credit report accordingly.

- If you do not immediately correct the disputed information on my credit report, please include the "Consumer Dispute" section above as my dispute statement for this account on my credit report.

212. Upon information and belief, Experian timely notified SLS of Plaintiff's dispute, but they both verified and continued reporting inaccurate, derogatory information.

213. SLS was required to conduct a reasonable investigation into this specific account on Plaintiff's consumer report pursuant to 15 U.SC. § 1681s-2(b)(1)(A).

214. Equifax was required to conduct a reasonable reinvestigation into this specific account on Plaintiff's consumer report pursuant to 15 U.S.C. §1681i and Cal. Civ. Code §1785.16.

215. On or about January 2018, Plaintiff received notification from Equifax and SLS received notice of Plaintiff's dispute pursuant to 15 U.S.C. § 1681i(a)(6) and were providing the results of their (re)investigation.

216. However, rather than remove the above derogatory information from Plaintiff's report, Equifax and SLS simply left derogatory information on Plaintiff's report.

217. Specifically, SLS and Equifax reported the following inaccurate and derogatory information on Plaintiff's credit in respect to the Account:

- Current Status – Included in Wage Earner Plan

///

///

///

///

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

218. SLS and Equifax's inaccurate reporting of bankruptcy notations associated with the account and failure to report Plaintiff's payment history, despite Metro 2 instructions indicating otherwise, caused the Account to automatically be placed in the "negative" or "adverse" sections of Plaintiff's credit report, which negatively impacted Plaintiff's creditworthiness.

219. Equifax did not provide notice to Plaintiff that her dispute was "frivolous or irrelevant," pursuant to 15 U.S.C. § 1681i(a)(3) or included Plaintiff's "Statement of Dispute" pursuant to 15 U.S.C. § 1681i(b).

220. Moreover, upon information and belief, the Equifax's reinvestigation was not reasonable. More specifically, Equifax should have discovered from its records, including Plaintiff's official dispute letters, that the information SLS was reporting was inaccurate and materially misleading. Equifax could have easily requested SLS to provide Plaintiff's payment records, which would have reflected Plaintiff was still making payments on the secured debt obligation following Plaintiff's Bankruptcy and was current on the Account for years.

221. Accordingly, Equifax failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff and violated 15 U.S.C. § 1681e(b) and Cal. Civ. Code §1785.14(b).

222. Accordingly, Equifax failed to conduct a reasonable reinvestigation with respect to the disputed information as required by 15 U.S.C. §1681i and Cal. Civ. Code §1785.16.

223. Upon information and belief, SLS's investigation was also not reasonable. More specifically, SLS should have discovered from its records, including Plaintiff's official dispute letters, that the information SLS was reporting was inaccurate and materially misleading. Specifically, SLS could have simply reviewed Plaintiff's Account with them and recognized that the correct, current status of Plaintiff's Account was current and in good standing for years. SLS could have also consulted with and conformed their credit reporting to properly

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

1    follow Metro 2 reporting instructions.

2    224. Accordingly, SLS failed to conduct a reasonable investigation with respect to

3          the disputed information as required by 15 U.SC. § 1681s-2(b) by:

4              a.  Failing to remove all of the disputed and incorrect information;

5              b.  Failing to update Plaintiff's Account (history); and

6              c.  Failing to notate, as required, Plaintiff's dispute.

7    225. Through this conduct, SLS has violated Cal. Civ. Code § 1785.25(a) by

8          furnishing information to Equifax, i.e. consumer reporting agencies, that SLS

9          knew or should known was inaccurate and materially misleading.

10   226. SLS and Equifax failed to review all relevant information provided by Plaintiff

11         in the dispute to Equifax as required by and in violation of 15 U.S.C. § 1681s-

12         2(b)(1)(B).

13   227. Due to SLS and Equifax's failure to reasonably (re)investigate, they each

14         further failed to correct and update Plaintiff's information as required by 15

15         U.S.C. § 1681s-2(b)(1)(E), thereby causing continued reporting of inaccurate

16         information in violation of 15 U.S.C. § 1681-s(2)(b)(1)(C).

17   228. Plaintiff's continued efforts to correct SLS and Equifax's erroneous and

18         negative reporting of the Debt by communicating Plaintiff's dispute with SLS

19         and Equifax were fruitless.

20   229. SLS and Equifax's continued inaccurate and negative reporting of the Debt in

21         light of its knowledge of the actual error was willful.

22   230. SLS and Equifax's failure to correct the previously disclosed inaccuracies on

23         Plaintiff's credit report was intentional and in reckless disregard of its duty to

24         refrain from reporting inaccurate information. Accordingly, SLS and Equifax

25         willfully and negligently failed to comply with its duty to reasonably investigate

26         Plaintiff's dispute.

27   231. SLS and Equifax's inaccurate and negative reporting damaged Plaintiff's

28         creditworthiness.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

232. By inaccurately reporting account information relating to the Debt after notice and confirmation of its errors, SLS and Equifax failed to take the appropriate measures as determined in 15 U.S.C. §§ 1681-s(2)(b)(1)(D) and (E).

**AMEX INACCURATE AND MATERIALLY MISLEADING CREDIT INFORMATION RE: ACCOUNT NO.: 349991385…**

233. In an Experian Credit Report dated August 18, 2017, AMEX reported the following inaccurate, misleading, and derogatory information for the above-referenced account number:

- Pay Status: Account charged off/Never late. $2,346 written off.
- Payment History: Charged Off October 2011 to April 2012 and March 2016.

234. There was also no notation, status update, or any other indication in the tradeline as it was reported to Experian that this AMEX account was included in or discharged in Plaintiff's Bankruptcy.

235. AMEX filed a proof of claim for $3,631.16 in Plaintiff's Bankruptcy.

236. According to the Bankruptcy Trustee's Final Report and Account (entered on May 26, 2015), AMEX's Debt was "unsecured" and over the course of the Plan, Plaintiff paid $75.14 towards this debt, while the remaining amount was scheduled for discharge because Plaintiff successfully completed the terms of the Plan.

237. AMEX received electronic notice of this report through the Bankruptcy Noticing Center on or about May 26, 2015.

238. It was inaccurate and materially misleading for AMEX to report the above derogatory delinquencies related to Plaintiff's pre-Bankruptcy obligations after March 13, 2012, because Plaintiff filed for Bankruptcy on March 13, 2012, at which point the automatic stay went into effect and severed AMEX's ability to enforce Plaintiff's purported pre-Bankruptcy obligations against Plaintiff personally in their pre-bankruptcy form.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

239. Moreover, the above adverse information was also inaccurate and materially misleading because the Bankruptcy Plan (i.e. the new contract between Plaintiff and AMEX) determined how AMEX would be paid. Failing to report consistent with the terms of the Bankruptcy Plan was therefore inaccurate and materially misleading.

240. Accordingly, if AMEX chose to continue reporting on Plaintiff's credit reports, AMEX was required to report accurately according to Plaintiff's participation in the Bankruptcy Plan.

241. Yet AMEX failed to accurately report according to Plaintiff's participation and payments stemming from the Bankruptcy Plan, making AMEX's reporting inaccurate and materially misleading under the FCRA and CCRAA.

242. The "Charge Off" and past due status notations by AMEX during the life of the Plan *and* post-discharge inaccurately and misleadingly suggested that Plaintiff was being delinquent on his repayment obligations to AMEX, which was not true.

243. Moreover, the post-Bankruptcy derogatory, delinquent information furnished by AMEX after Plaintiff filed the Bankruptcy was inaccurate and materially misleading because end users, including potential creditors, would interpret the delinquencies to mean that Plaintiff was being noncompliant with her repayment obligations during the Bankruptcy Plan, which was not true.

244. Plaintiff followed the terms of her Bankruptcy Plan by consistently making the necessary payments to her Bankruptcy Trustee nearly every month for approximately three years.

245. Therefore, Plaintiff was not delinquent on the AMEX account during the pendency of the Bankruptcy, and it was inaccurate and materially misleading for AMEX to report that Plaintiff was delinquent after the Bankruptcy.

///

///

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

246. Accordingly, pursuant to the terms of the Bankruptcy Orders and the Metro 2 reporting standards discussed, it was inaccurate and materially misleading for AMEX to report delinquencies following Plaintiff's Bankruptcy filing and discharge.

247. Again, the Bankruptcy Court confirmed that Plaintiff successfully completed the Plan and entered a "Discharge of Debtor After Completion of Chapter 13 Plan" Order on August 24, 2015.

248. Accordingly, any remaining Debt to AMEX not paid over the life of the Plan was discharged through the Bankruptcy and AMEX received notice of the successful discharge through the Bankruptcy Noticing Center on or about August 24, 2015 by first class mail through the Bankruptcy Noticing Center.

249. Rather than using the bankruptcy information sent specifically to AMEX, which AMEX knew or should have known existed, AMEX continued reporting inaccurately on Plaintiff's credit reports.

250. AMEX's credit reporting information is relevant to Plaintiff's credit score, and AMEX's inaccurate reporting is materially misleading and therefore adversely affects Plaintiff's creditworthiness.

251. Therefore, AMEX's inaccurate, materially misleading, and negative reporting of the Debt in light of their knowledge of the Bankruptcy was willful.

252. Through this conduct, AMEX has violated Cal. Civ. Code § 1785.25(a) by furnishing information to Experian that AMEX knew or should known was inaccurate and materially misleading.

**CITIBANK INACCURATE AND MATERIALLY MISLEADING CREDIT INFORMATION RE: ACCOUNT NO.: 922063...**

253. In an Experian Credit Report dated August 18, 2017, CitiBank reported the following inaccurate, misleading, and derogatory information for the above-referenced account number:

- Pay Status: Account charged off. $67,790 written off.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

- Recent Balance: $66,358 as of Jul 2017.
- Payment History: Charged Off September 2012 to July 2017.
- Account History: Account balances in excess of $66,000 from August 2015 to June 2017.

254. There was also no notation, status update, or any other indication in the tradeline as it was reported to Experian that this CitiBank account was included in or discharged in Plaintiff's Bankruptcy.

255. CitiBank filed a proof of claim for $68,000 in Plaintiff's Bankruptcy.

256. According to the Bankruptcy Trustee's Final Report and Account (entered on May 26, 2015), CitiBank's Debt was "unsecured" and over the course of the Plan, Plaintiff paid $1,432.36 towards this debt, while the remaining amount was scheduled for discharge because Plaintiff successfully completed the terms of the Plan.

257. CitiBank received electronic notice of this report through the Bankruptcy Noticing Center on or about May 26, 2015.

258. It was inaccurate and materially misleading for CitiBank to report the above derogatory delinquencies related to Plaintiff's pre-Bankruptcy obligations after March 13, 2012, because Plaintiff filed for Bankruptcy on March 13, 2012, at which point the automatic stay went into effect and severed CitiBank's ability to enforce Plaintiff's purported pre-Bankruptcy obligations against Plaintiff personally in their pre-bankruptcy form.

259. Moreover, the above adverse information was also inaccurate and materially misleading because the Bankruptcy Plan (i.e. the new contract between Plaintiff and CitiBank) determined how CitiBank would be paid. Failing to report consistent with the terms of the Bankruptcy Plan was therefore inaccurate and materially misleading.

///

///

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

260. Accordingly, if CitiBank chose to continue reporting on Plaintiff's credit reports, CitiBank was required to report accurately according to Plaintiff's participation in the Bankruptcy Plan.

261. Yet CitiBank failed to accurately report according to Plaintiff's participation and payments stemming from the Bankruptcy Plan, making CitiBank's reporting inaccurate and materially misleading under the FCRA and CCRAA.

262. It was inaccurate and materially misleading for CitiBank to report the above balance amounts because Plaintiff no longer had an obligation owing on the account following her successful bankruptcy discharge. As mentioned, the legal impact of the bankruptcy was reflected in Metro 2 instructions dictating bureaus and furnishers to report a balance of $0 for unsecured accounts.

263. The "Charge Off" and past due status notations by CitiBank during the life of the Plan *and* post-discharge inaccurately and misleadingly suggested that Plaintiff was being delinquent on his repayment obligations to CitiBank, which was not true.

264. Moreover, the post-Bankruptcy derogatory, delinquent information furnished by CitiBank after Plaintiff filed the Bankruptcy was inaccurate and materially misleading because end users, including potential creditors, would interpret the delinquencies to mean that Plaintiff was being noncompliant with her repayment obligations during the Bankruptcy Plan, which was not true.

265. Plaintiff followed the terms of her Bankruptcy Plan by consistently making the necessary payments to her Bankruptcy Trustee nearly every month for approximately three years.

266. Therefore, Plaintiff was not delinquent on the CitiBank account during the pendency of the Bankruptcy, and it was inaccurate and materially misleading for CitiBank to report that Plaintiff was delinquent after the Bankruptcy.

///

///

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

267. Accordingly, pursuant to the terms of the Bankruptcy Orders and the Metro 2 reporting standards discussed, it was inaccurate and materially misleading for CitiBank to report delinquencies following Plaintiff's Bankruptcy filing and discharge.

268. Again, the Bankruptcy Court confirmed that Plaintiff successfully completed the Plan and entered a "Discharge of Debtor After Completion of Chapter 13 Plan" Order on August 24, 2015.

269. Accordingly, any remaining Debt to CitiBank not paid over the life of the Plan was discharged through the Bankruptcy and CitiBank received notice of the successful discharge through the Bankruptcy Noticing Center on or about August 24, 2015 by first class mail through the Bankruptcy Noticing Center.

270. Rather than using the bankruptcy information sent specifically to CitiBank, which CitiBank knew or should have known existed, CitiBank continued reporting inaccurately on Plaintiff's credit reports.

271. CitiBank's credit reporting information is relevant to Plaintiff's credit score, and CitiBank's inaccurate reporting is materially misleading and therefore adversely affects Plaintiff's creditworthiness.

272. Therefore, CitiBank's inaccurate, materially misleading, and negative reporting of the Debt in light of their knowledge of the Bankruptcy was willful.

273. Through this conduct, CitiBank has violated Cal. Civ. Code § 1785.25(a) by furnishing information to Experian that CitiBank knew or should known was inaccurate and materially misleading.

### FDS'S INACCURATE AND MATERIALLY MISLEADING CREDIT INFORMATION RE: ACCOUNT NO.: 45043510…

274. In an Experian Credit Report dated August 18, 2017, FDS reported the following inaccurate, misleading, and derogatory information for the above-referenced account number:

- Pay Status: Account charged off. $770 written off.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

- Payment History: Charged Off February 2012 to July 2017.

275. There was also no notation, status update, or any other indication in the tradeline as it was reported to Experian that this FDS account was included in or discharged in Plaintiff's Bankruptcy.

276. FDS filed a proof of claim for $769.82 in Plaintiff's Bankruptcy.

277. According to the Bankruptcy Trustee's Final Report and Account (entered on May 26, 2015), FDS Debt was "unsecured" and over the course of the Plan, Plaintiff paid $16 towards this debt, while the remaining amount was scheduled for discharge because Plaintiff successfully completed the terms of the Plan.

278. FDS received electronic notice of this report through the Bankruptcy Noticing Center on or about May 26, 2015.

279. It was inaccurate and materially misleading for FDS to report the above derogatory delinquencies related to Plaintiff's pre-Bankruptcy obligations after March 13, 2012, because Plaintiff filed for Bankruptcy on March 13, 2012, at which point the automatic stay went into effect and severed FDS's ability to enforce Plaintiff's purported pre-Bankruptcy obligations against Plaintiff personally in their pre-bankruptcy form.

280. Moreover, the above adverse information was also inaccurate and materially misleading because the Bankruptcy Plan (i.e. the new contract between Plaintiff and FDS) determined how FDS would be paid. Failing to report consistent with the terms of the Bankruptcy Plan was therefore inaccurate and materially misleading.

281. Accordingly, if FDS chose to continue reporting on Plaintiff's credit reports, FDS was required to report accurately according to Plaintiff's participation in the Bankruptcy Plan.

282. Yet FDS failed to accurately report according to Plaintiff's participation and payments stemming from the Bankruptcy Plan, making FDS reporting inaccurate and materially misleading under the FCRA and CCRAA.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

283. The "Charge Off" and past due status notations by FDS during the life of the Plan *and* post-discharge inaccurately and misleadingly suggested that Plaintiff was being delinquent on his repayment obligations to FDS, which was not true.

284. Moreover, the post-Bankruptcy derogatory, delinquent information furnished by Macy's after Plaintiff filed the Bankruptcy was inaccurate and materially misleading because end users, including potential creditors, would interpret the delinquencies to mean that Plaintiff was being noncompliant with her repayment obligations during the Bankruptcy Plan, which was not true.

285. Plaintiff followed the terms of her Bankruptcy Plan by consistently making the necessary payments to her Bankruptcy Trustee nearly every month for approximately three years.

286. Therefore, Plaintiff was not delinquent on the FDS account during the pendency of the Bankruptcy, and it was inaccurate and materially misleading for FDS to report that Plaintiff was delinquent after the Bankruptcy.

287. Accordingly, pursuant to the terms of the Bankruptcy Orders and the Metro 2 reporting standards discussed, it was inaccurate and materially misleading for FDS to report delinquencies following Plaintiff's Bankruptcy filing and discharge.

288. Again, the Bankruptcy Court confirmed that Plaintiff successfully completed the Plan and entered a "Discharge of Debtor After Completion of Chapter 13 Plan" Order on August 24, 2015.

289. Accordingly, any remaining Debt to FDS not paid over the life of the Plan was discharged through the Bankruptcy and FDS received notice of the successful discharge through the Bankruptcy Noticing Center on or about August 24, 2015 by first class mail through the Bankruptcy Noticing Center.

290. Rather than using the bankruptcy information sent specifically to FDS, which FDS knew or should have known existed, FDS continued reporting inaccurately on Plaintiff's credit reports.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

291. FDS's credit reporting information is relevant to Plaintiff's credit score, and FDS inaccurate reporting is materially misleading and therefore adversely affects Plaintiff's creditworthiness.

292. Therefore, FDS's inaccurate, materially misleading, and negative reporting of the Debt in light of their knowledge of the Bankruptcy was willful.

293. Through this conduct, FDS has violated Cal. Civ. Code § 1785.25(a) by furnishing information to Experian that FDS knew or should known was inaccurate and materially misleading.

### CHASE INACCURATE AND MATERIALLY MISLEADING CREDIT INFORMATION RE: ACCOUNT NO.: 541822654430…

294. In an Equifax Credit Report dated August 18, 2017, Chase reported the following inaccurate, misleading, and derogatory information for the above-referenced account number:

- Pay Status: Charge Off
- Scheduled Payment Amount: $11,643

295. There was also no notation, status update, or any other indication in the tradeline as it was reported to Equifax that this Chase account was included in or discharged in Plaintiff's Bankruptcy.

296. However, Chase's debt was discharged in the Bankruptcy.

297. On or about December 28, 2017, Plaintiff disputed Chase's reported information regarding the account by notifying Equifax, in writing, of the incorrect and inaccurate credit information furnished by Chase.

298. Specifically, Plaintiff sent a letter, via certified mail, to Equifax (the "Dispute Letter"), requesting the above inaccurate information be deleted pursuant to Plaintiff's Bankruptcy Discharge and corresponding Metro 2 instructions.

///

///

///

299. The Dispute Letter expressed:

> This account was included and discharged in my Chapter 13 Bankruptcy, which was filed on 03/13/2012 and discharged on 08/24/2015, bearing docket No.12-24844-B-13J in the Eastern District of California(Sacramento). Accordingly, the scheduled payment amount, current balance, balloon payment, and amount past due on this account should be "$0" and the status should be reporting as "discharged through bankruptcy" or the equivalent. This account should also be reported as "closed" as opposed to "open." Moreover, there should be no delinquencies or major delinquencies reporting after the filing date of the bankruptcy in the history of this account because I consistently followed my repayment obligations under the Chapter 13 Wage Earner Plan. Any duplicative reporting of this account in my credit history should be deleted as well. Lastly, any balances and scheduled payments reporting following the confirmation of the Chapter 13 Wage Earner Plan must be consistent with the terms of the Chapter 13 Wage Earner Plan, as opposed to reporting in their pre-bankruptcy filing form.

300. The Dispute Letter further requested that Equifax:

- Immediately delete the disputed derogatory information from my credit report and update my credit report accordingly.
- If you do not immediately correct the disputed information on my credit report, please include the "Consumer Dispute" section above as my dispute statement for this account on my credit report.

301. Equifax was required to conduct a reasonable reinvestigation of Plaintiff's dispute pursuant to 15 U.S.C. §1681i and Cal. Civ. Code §1785.16.

302. On or about January 22, 2018, Plaintiff received the results of Equifax's (re)investigation in the form of a letter from Equifax with Plaintiff's updated credit report.

303. However, rather than remove the above derogatory information from Plaintiff's report, Equifax simply left derogatory information on Plaintiff's report.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

304. Specifically, Equifax reported the following inaccurate and derogatory information on Plaintiff's credit in respect to the disputed Chase account:

- Status – Charge Off

305. Equifax did not provide notice to Plaintiff that her dispute was "frivolous or irrelevant," pursuant to 15 U.S.C. § 1681i(a)(3) or include Plaintiff's "Statement of Dispute" pursuant to 15 U.S.C. § 1681i(b).

306. Upon information and belief, Equifax's reinvestigation was unreasonable. More specifically, Equifax should have discovered from its records, including Plaintiff's official dispute letter, that the information Chase was reporting was inaccurate and materially misleading. Equifax could have easily ascertained that the Chase account had no further obligation owed on it by reviewing the publicly available and accessible bankruptcy records discussed above, consulting the Metro 2 guidelines for bankruptcy accounts delineated above, or contacting Plaintiff for more information. Instead, upon information and belief, Equifax conducted a superficial "reinvestigation" and merely doubled-down on their inaccurate reporting.

307. Such conduct by Equifax is willful and reckless.

308. Accordingly, Equifax failed to conduct a reasonable reinvestigation of Plaintiff's dispute, as required by 15 U.S.C. §1681i and Cal. Civ. Code §1785.16.

309. Further, Equifax failed to follow reasonable procedures to assure maximum possible accuracy of the information concerning Plaintiff and violated 15 U.S.C. § 1681e(b) and Cal. Civ. Code §1785.14(b).

310. Equifax failed to review all relevant information provided by Plaintiff in the dispute to Equifax as required by and in violation of 15 U.SC. § 1681s-2(b)(1)(B).

///

///

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

311. Due to Equifax's failure to reasonably (re)investigate, they further failed to correct and update Plaintiff's information as required by 15 U.S.C. § 1681s-2(b)(1)(E), thereby causing continued reporting of inaccurate information in violation of 15 U.S.C. § 1681-s(2)(b)(1)(C).

312. Plaintiff's continued efforts to correct Equifax's erroneous and negative reporting of the Debt by communicating Plaintiff's dispute with Equifax were fruitless.

313. Equifax's continued inaccurate and negative reporting of the Debt in light of its knowledge of the actual error was willful.

314. Equifax's failure to correct the previously disclosed inaccuracies on Plaintiff's credit report was intentional and in reckless disregard of its duty to refrain from reporting inaccurate information. Accordingly, Equifax willfully and negligently failed to comply with its duty to reasonably reinvestigate Plaintiff's dispute.

315. Equifax's inaccurate and negative reporting damaged Plaintiff's creditworthiness.

316. By inaccurately reporting account information relating to the Debt after notice and confirmation of its errors, Equifax failed to take the appropriate measures as determined in 15 U.S.C. §§ 1681-s(2)(b)(1)(D) and (E).

///
///
///
///
///
///
///
///
///

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

## CAUSES OF ACTION

## COUNT I

### VIOLATION OF THE FAIR CREDIT REPORTING ACT

### 15 U.S.C. §§ 1681 ET SEQ.

### [AGAINST ALL DEFENDANTS EXCEPT FDS, AMEX, AND CITIBANK]

317. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

318. The foregoing acts and omissions constitute numerous and multiple willful, reckless, or negligent violations of the FCRA, including, but not limited to, each and every one of the above-cited provisions of the FCRA, 15 U.S.C. § 1681.

319. As a result of each and every negligent noncompliance of the FCRA, Plaintiff is entitled to actual damages as the Court may allow pursuant to 15 U.S.C. § 1681o(a)(1); and reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1681o(a)(2), from Defendants.

320. As a result of each and every willful violation of the FCRA, Plaintiff is entitled to actual damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(1); statutory damages pursuant to 15 U.S.C. § 1681n(a)(1); punitive damages as the Court may allow, pursuant to 15 U.S.C. § 1681n(a)(2); and reasonable attorney's fees and costs pursuant to 15 U.S.C. § 1681n(a)(3) from Defendants.

## COUNT II

### VIOLATION OF CALIFORNIA CONSUMER CREDIT REPORTING AGENCIES ACT

### CAL. CIV. CODE § 1785.1 ET SEQ.

### [AGAINST ALL DEFENDANTS]

321. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

322. The foregoing acts and omissions constitute numerous and multiple violations of the California Consumer Credit Reporting Agencies Act.

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

323. As a result of each and every negligent violation of the CCRAA, Plaintiff is entitled to damages as the Court may allow pursuant to Cal. Civ. Code § 1785.31(a)(1) from Defendants.

324. As a result of each and every willful violation of the CCRAA, Plaintiff is entitled to damages as the Court may allow pursuant to Cal. Civ. Code § 1785.31(a)(2) against Defendants, including punitive damages of $100-$5,000 per willful violation.

325. Because Furnisher-Defendants are partnerships, corporations, associations, or other entities, and are therefore each a "person" as that term is defined by Cal. Civ. Code § 1785.3(j), Furnisher-Defendants are and always were obligated to not furnish information on a specific transaction or experience to any consumer credit reporting agency if they knew or should have known that the information is incomplete or inaccurate, as required by Cal. Civ. Code § 1785.25(a). Thus, Furnisher-Defendants violated Cal. Civ. Code § 1785.25(a).

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants:

- An award of actual damages, in an amount to be determined at trial or damages of a maximum of $1,000 pursuant to 15 U.S.C. § 1681n(a)(1)(A), against Defendants for each incident of willful noncompliance of the FCRA;

- An award of punitive damages, as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(2), against Defendants for each incident of willful noncompliance to the FCRA;

- An award for costs and reasonable attorney's fess, pursuant to 15 U.S.C. § 1681n(a)(3), against Defendants for each incident of negligent noncompliance of the FCRA;

///

///

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

- An award of actual damages in an amount to be determined at trial pursuant to 15 U.S.C. § 1681o(a)(1) against Defendants for each incident of negligent noncompliance of the FCRA;

- An award of costs and litigation and reasonable attorney's fees pursuant 15 U.S.C. § 1681n(a)(3) and 15 U.S.C. § 1681o(a)(2) against Defendants for each incident of noncompliance of the FCRA;

- An award of actual damages, in an amount to be determined at trial, pursuant to Cal. Civ. Code § 1785.31(a)(2)(A), against Defendants;

- Award of attorneys' fees and costs pursuant to Cal. Civ. Code § 1785.31(a)(1); and, Cal. Civ. Code § 1785.31(d) against Defendants;

- An award of punitive damages of $100-$5,000 per willful violation of Cal. Civ. Code § 1785.25(a), pursuant to Cal. Civ. Code § 1785.31(a)(2)(B) against Defendants;

- For equitable and injunctive relief pursuant to Cal. Civ. Code § 1785.31(b) against Defendants; and

- Any and all other relief the Court deems just and proper.

Dated: June 22, 2018                    Respectfully submitted,

                                        **C.O. LAW, APC**


                                        By: /s/ Clark Ovruchesky
                                        CLARK OVRUCHESKY, ESQ.
                                        ATTORNEY FOR PLAINTIFF

///
///
///
///
///
///

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110

---

**COMPLAINT FOR DAMAGES**

## TRIAL BY JURY

326. Pursuant to the seventh amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

Dated: June 22, 2018                    Respectfully submitted,

**C.O. LAW, APC**


By: /s/ Clark Ovruchesky
    CLARK OVRUCHESKY, ESQ.
    ATTORNEY FOR PLAINTIFF

C.O. LAW, APC
3148 MIDWAY DR., SUITE 203
SAN DIEGO, CA 92110